## KARTHAUS vs. OWINGS.

APPEAL from *Baltimore* County Court. This was an action of replevin, and at the trial in the county court in April 1809, the plaintiff (now appellant,) offered in evidence, that one *J. M. Minor*, residing in the city of *Baltimore*, and carrying on the business of a merchant, was the owner of the goods and merchandizes mentioned in the bill of lading herein after mentioned; and being such owner, on the 9th of January 1807, shipped them at the port of *Baltimore*, on board the schooner *Eagle*, commanded by *D. Havens*. to be transported from that port to *Cumana*, in the *West Indies*, for *Minor's* sole account and risk, and consigned to the defendant, (the appellee,) as his agent and supercargo, for sale, and that *Havens*, the captain of the schooner, did on the said 9th of January 1807, sign three bills of lading for the said goods. That one of the bills of lading was delivered by *Minor*, before the sailing of the vessel, to the defendant, one other to *Havens*, accompanied with an affidavit of *Minor* made on the 10th of January 1807, with the knowledge of the defendant, that he was the owner of the goods mentioned in the bills of lading, and the other of the bills of lading was retained by *Minor*. That the schooner cleared out at the custom house in the port of *Baltimore* on the 10th of January 1807, for *Cumana*, and sailed on the 13th of January, 1807, and that the defendant went in her as supercargo. That *Minor* on the 2d of March 1807 applied to the plaintiff for the loan of his promissory notes for his, *Minor's* accommodation, and produced to the plaintiff the said bill of lading, and an invoice and policy of insurance, both of which were for the property mentioned in the bill of lading, as evidences of his property in the said goods, and an assignment of them was offered by him to the plaintiff to guarantee and secure him against all loss from so loaning him his promissory notes; and that thereupon the plaintiff did loan to him his promissory notes to the amount of $4,500, and *Minor* did then assign and transfer, by endorsing his name in blank on the said bill of lading, invoice and policy of insurance, for the said goods, to the plaintiff, as an indemnification and security

*J M, being the owner of certain goods, &c. on the 9th of January 1807, shipped them at B, to be carried to C, for his sole account and risk, and consigned to J O as his agent and supercargo, for sale The captain of the vessel on the same day sign'd three bills of lading, one retained by J M, one delivered by him to J O, one to the captain, with an affidavit of J M, made on the next day, with the knowledge of J O, that he was the owner of the goods. Before the 10th of January 1807, it was agreed upon between J M and J O, that the latter was to sail as the consignee and supercargo of the goods; and it was agreed in writing, that the goods should be considered on their joint account, that is, two third to J M. and the other third to J O. After the execution of the agreement, and on the same day it was agreed between J M and J O, that in consideration that J O would become an endorser on sundry promissory notes about to be given by J M to the persons of whom he had purchased a part of the goods; J O should retain and have a lien on the whole of the goods, and the proceeds*

*arising from the sale thereof, to reimburse and indemnify him. J O did endorse such notes, and had paid them, J M becoming insolvent and failing to do so. The vessel sailed on the 13th of January 1807, and arrived at C, and the goods were delivered to J O, who sold them, and invested the proceeds in a return cargo, which he shipped on board the same vessel for B, the captain giving to J O a bill of lading and manifest, stating that the goods had been shipped for the joint account and risk of J M and J O, and to be delivered unto J M and J O, or their assigns It was alleged that the bill of lading was originally made out, consigning the goods to J M alone, and afterwards, and with different ink, the words "and J O" were interlined, and the word "his" altered into the word "their." On the 2d of March 1807, J M applied to P K for the loan of his promissory notes, and P K did loan to him his promissory notes, and to guarantee P K against any loss. J M assigned to P K the bill of lading first herein mentioned, invoice and policy of insurance for the goods. Before the return of the vessel to B, P K had been obliged to pay the notes he had loaned to J M. P K had no knowledge of the agreement between J M and J O at the time of the assignment of the bill of lading, &c. On the arrival of the vessel at B, with the return cargo on board, on the 22d of May 1807, the cargo was delivered to J O. who bonded for and paid the duties thereon to the U. S. P K afterwards replevied the goods out of the possession of J O—Held, that P K was not entitled to recover.*

*On a bill filed in chancery, it was decreed, on the above facts, that J O, a supercargo and consignee of the outward cargo, and in virtue of the verbal and written agreement, had a right to retain the inward cargo, and had a lien thereon to reimburse himself for all advances made by him, and to satisfy any balance which might be due to him on a final adjustment of the transactions in trade between him and J M. That J O, in making the alteration in the bill of lading did not act fraudulently, nor did he acquire any new rights thereby. He had a right to stop the goods in transitu.*

*Quere.* What would have been the situation of the parties if there had been no agreement?

for so loaning him his promissory notes. That after the said endorsements the schooner *Eagle*, with the said goods and the defendant on board, arrived at *Cumana*, where the defendant sold and disposed of the outward cargo, and then with the schooner proceeded to *Laguira*, where he invested the proceeds of the outward cargo in a return cargo, consisting of the goods, &c. mentioned in the writ and declaration in this cause, which goods were marked with the letters *J. M* only, that the return cargo was shipped on board the *Eagle* at *Laguira* by the defendant; and *Havens*, the master of the schooner, under the authority. and with the approbation of the defendant, signed the following bill of lading and manifest, viz. "Shipped in good order and well conditioned by *James Owings*, in and upon the good schooner called *The Eagle*, whereof is master for this present voyage *D. Havens*, and now riding in the port of *Laguira*, and bound for *Baltimore*, to say 168 barrels of coffee," &c. "for the joint account and risk of the said *Owings* and *John M. Minor*, being marked" &c. "to be delivered," &c. "unto Messrs. *John M. Minor* and *James Owings*, or their assigns," &c. Dated the 22d of April 1807. Then follows the manifest, &c. Which bill of lading and manifest, so far as the manifest relates to the goods, &c. in the writ and declaration in this cause, were, as the plaintiff contended, upon the exhibition of the bill of lading, and without producing any other proof of the fact, originally made out, consigning the said goods to *Minor* alone, and that afterwards, and with different ink, the words "and *James Owings*," were interlined in the same, and that in the bill of lading the word "*Mr*" was altered into "*Messrs.*" and the word "*his*" into the word "*their*." That the schooner arrived at *Baltimore* from *Laguira* on the 22d of May 1807, with the said goods mentioned in the declaration on board; and that before the arrival of the schooner at *Baltimore*, the plaintiff had been obliged to pay the promissory notes so loaned to *Minor*. That the defendant on the 9th of January 1807, and for some years preceding, resided in the city of *Baltimore*, and that the same was known to the plaintiff at the time he agreed to receive the endorsement and assignment of the bill of lading, invoice and policy of insurance, as herein before stated. That it is the established custom of merchants in *Baltimore*, when a merchant ships goods to the *West Indies*, and employs a supercargo, to fill up the bills of lading in the same manner as the bills of lading endorsed to the plaintiff by *Minor*, and that the shipper is at liberty to give instructions to the supercargo, directing the particular manner in which he shall manage the goods so committed to his charge, and that the supercargo so made, is considered only as the agent and attorney of the shipper, acting under his authority, and subject to such instructions as he may from time to time receive from his employer; and that a bill of lading and invoice of the goods, are always retained by the

shipper.   The plaintiff further gave in evidence, by cross examination of a witness sworn on the part of the defendant, that he was present at the contract between the plaintiff and *Minor*, relative to the loan of the promissory notes, and saw *Minor* endorse the bill of lading, invoice and policy of insurance, to the plaintiff; and that neither the witness, nor *Minor*, as he heard, did at that time, or at any other time, to the knowledge of the witness, inform the plaintiff of the agreement between *Minor* and the defendant, as hereinafter mentioned, or of any interest which the defendant had in the said goods, other than as mere supercargo.   And that the agreement was drawn up in the hand-writing of the witness, and was executed in his presence, and that he was privy to the arrangements between *Minor* and the defendant relative to the said goods, as hereinafter stated.   The defendant gave in evidence, by a competent witness, that during the month of January 1807, and for a considerable length of time previous thereto, he acted as clerk to *Minor*, and that during the beginning of the said month of January, *Minor* purchased sundry goods and merchandize of divers persons in the city of *Baltimore*, which on the 8th and 9th of that month he loaded and shipped on board the schooner *Eagle*, whereof *D. Havens* was master, which merchandize is more particularly described by the original invoice thereof, and the bill of lading delivered to the defendant by *Minor* before the sailing of the schooner, and which invoice and bill of lading the defendant read in evidence.   The said witness further gave in evidence, that antecedently to the 10th of January 1807, it was agreed upon between *Minor* and the defendant, that the latter was to sail as the consignee and supercargo of the said merchandize, shipped as aforesaid on board the said schooner.   That on the 10th of January aforesaid, it was agreed and concluded on between *Minor* and the defendant, that the said goods should be considered on the joint account of *Minor* and the defendant, agreeably to the memorandum of agreement then drawn up by the witness, and signed and sealed by *Minor* and the defendant, and delivered to the defendant by *Minor* in the presence of the witness, who attested the same.   Which said agreement, produced by the defendant, admitted as evidence by the parties, is as follows, viz. "It is the understanding and agreement by and between *John M. Minor* and *James Owings*, that the goods shipped by *John M. Minor* on board the schooner *Eagle*, *Daniel Havens* master, for *Cumana* and a market, are and shall be considered on the joint account of the parties; that is, the two thirds to said *Minor*, and the other third to the said *Owings*.   And we consider ourselves bound to pay each our proportion for the said goods and insurance when due, as well as necessary charges.   The said *Owings* is to receive a commission on the sales and purchases with the proceeds, the same as from other shippers by the vessel, and the same freight, and payable at

the same time as the said *Owings* has to pay the said *Ha-vens*, as per charter party." The witness further gave in evidence, that after the execution of the said agreement, and on the same day, upon a further consideration between *Minor* and the defendant, it was agreed between them, that in consideration that the defendant would become the endorsor on sundry promissory notes about to be given by *Minor* to sundry persons of whom he had purchased a part of the said goods, and on account thereof, the defendant should retain and have a lien upon the whole of the said goods, and the proceeds arising from the sale thereof, to reimburse and indemnify him for all sums of money which he should pay on account of the said endorsements, or which were therefore, or should thereafter, become due and owing from *Minor* to the defendant. That the defendant, on the faith of such agreement, endorsed the said promissory notes, which were afterwards delivered by *Minor* to the vendors of the said goods; and which notes, it is admitted by the parties, have been satisfied and paid by the defendant, upon *Minor's* having become insolvent and failing to do so—which said promissory notes were produced by the defendant, and read as evidence, with the consent of the plaintiff, amounting in all to the sum of $4642 41. The defendant further offered evidence, that he entered on board the schooner *Eagle*, and sailed from the port of *Baltimore* on the 13th of January, 1807, for the port of destination, where she arrived, and at which port *Havens*, agreeably to his bill of lading, delivered the goods to the defendant, who sold and disposed of the same, and invested the proceeds thereof in a return cargo at the port of *Laguira*, where the same was shipped by the defendant on board the *Eagle*, whereof *Havens* was master, and for which return cargo *Havens* gave to the defendant the bill of lading now produced by the defendant and read in evidence, and which is herein before mentioned. The defendant further offered evidence, that the *Eagle* sailed from *Laguira* with the return cargo, and the defendant on board, and arrived at *Baltimore;* that upon her arrival *Havens* returned to the custom-house officer of the *U. S* at *Baltimore*, a manifest of the cargo of the *Eagle*, in due form, which was produced by the plaintiff, and read in evidence, with the consent of the defendant, and is relied on by the defendant, and is as herein before mentioned. The defendant also read in evidence, with the consent of the plaintiff, two bonds each for $834 60, given by the defendant, with *C. C. E.* and *S. O.* as his sureties, to secure to the *U. S.* the duties on the said return cargo; which said bonds, it is admitted by the parties, have been satisfied and paid by the defendant. He further offered evidence, that after the arrival of the *Eagle* at *Baltimore*, the said return cargo, mentioned in the last mentioned bill of lading was, in pursuance thereof, delivered to him the defendant, and was by the plaintiff afterwards replevied, and taken out of the possession of the defendant. That

the value of the said return cargo at the port of *Baltimore* was about $10,832. The defendant then moved the court to direct the jury, that the plaintiff was not entitled to recover upon the above statement of facts. Which direction the Court [*Nicholson*, Ch. J.] gave to the jury. The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued at December term 1811, before BUCHANAN, EARLE and JOHNSON, J.

*Winder*, for the Appellant, cited *Coxe vs. Harden*, 4 *East*, 211.

*T. B. Dorsey*, for the Appellee, cited *Wright vs. Campbell*, 4 *Burr.* 2046. *Hibbert vs. Carter*, 1 *T. R.* 745. *Evans vs. Marlett*, 1 *Ld. Raym.* 271. *Coxe vs. Harden*, 4 *East*, 211, per Lord *Ellenborough*.

JUDGMENT AFFIRMED.

After which *Karthaus* filed a bill in chancery against *Owings*, charging him with fraud, &c. And as a foundation for relief he relied upon the facts stated in the bill of exceptions herein before mentioned, and which were proved, &c. But that the fact of the alteration of the bill of lading was not proved at law. The bill prayed for relief, &c. and also for an injunction to stay proceedings on the judgment at law, which was granted. *Owings* by his answer admitted that the return cargo was shipped in the name of *Minor* only, and that he interlined his own name in the bills of lading and manifest, after he arrived at the port of *Baltimore.*

KILTY, Chancellor, (February Term 1816.) I am of opinion, that the complainant had a property in, or a lien on, the goods composing the return cargo, consigned to *J. M Minor* under the assignment in the bill of lading of the outward cargo, to the extent of his claim intended to be secured thereby; that this property or lien was not affected by the private agreement between *Minor* and *Owings* previous to the sailing of the schooner from *Baltimore*, the said agreement, under the circumstances disclosed, being considered fraudulent; that the alteration of the bill of lading by *Owings* was a fraud. And that it does not appear from the transcript of the record exhibited, that the whole question as to the fraud was so fully before the court of law, as to preclude this court from considering the case after the verdict, supposing its concurrent jurisdiction not to be otherwise sufficient. The shipment from *Baltimore* was made on the sole account of *Minor*, and the consignment to *Owings* as agent and supercargo, gave him no right to the goods on his own account. The bills of lading delivered to *Owings* and the captain, were accompanied with *Minor's* affidavit that he

1817.

Karthaus
vs
Owings

1817.

Karthaus
vs
Owings

was the owner of the goods. The agreement in writing that the goods shipped should be on the joint account of *Minor* and *Owings*, was inconsistent with the fact appearing on the bill of lading left with *Minor*, and no alteration was made in that and the other bills, although the schooner remained in port three days longer. This written agreement was concealed from *Karthaus* by *Minor*, and also by *Gillet* his clerk, and the witness in the suit at law. The verbal agreement proved by him to have been made the same day by which *Owings* was to have a lien on the goods, was in like manner concealed; and although *Owings* had a right to take a security on account of his endorsements, it should have been done by direct and open means, without leaving in *Minor* an apparent right by which third persons might be defrauded and injured. It is admitted by *Owings* in his answer, that he shipped the return cargo in the name of *Minor* alone, though with the intention of holding the property as part owner; and that he altered the bill of lading after his arrival at the fort near *Baltimore*, by adding for the joint account and risk of *James Owings* and *John M. Minor*. And he states, that it was for the purpose of making an entry at the custom house, and of holding the property under the agreement.

I shall not inquire as to what was necessary to make an entry at the custom house; but as to the other purpose, I consider the act as unauthorised and fraudulent. This fact does not appear from the transcript of the record to have been fully before the court and jury, it being stated in the bill of exceptions that the plaintiff contended that the bill of lading was made out consigning the goods to *Minor* alone, upon the exhibit of the said bill, without producing any other proof of the fact. The probability of the present complainant having had *it in his power* to produce further testimony *as to this fact,* is not considered sufficient to prevent the interference of this court. As to its general power in such cases, the opinion of the court of appeals, in their affirmance of the decree, in the case of *Singery vs. The Attorney General,* 2 *Harr. & Johns.* 487, had some bearing on the question. The nature of the decree to be made is next to be considered. The complainant in his bill states, that 168 barrels of coffee, and 6 seroons of indigo, were delivered to him on the writ of replevin; that he caused a part to be sold, which produced the nett sum of $4,061 23 to him, and that he gave the defendant liberty to sell the remainder, which he did, the nett proceeds amounting to $5,207 78, being retained in his hands. A decree to account, which is stated to be one of the objects of the bill, will not be made; but adverting to the proceedings, and *the order of injunction,* such decree will be passed as will leave *the* complainant the benefit of what he kept in his hands *Decreed,* that the injunction be perpetual, &c. From which decree the defendant, *(Owings,)* appealed to this court.

The cause was argued at this term before CHASE, Ch. J. and BUCHANAN, JOHNSON, and MARTIN, J.

*Martin* and *Moale*, for *Owings*, the Appellant, contended—1. That the appellee was precluded from any relief in equity by the trial at law. 2. That on the merits the equity was with the appellant. They referred to *Caldwell vs. Ball*, 1 *T. R.* 205. *Newson vs. Thornton*, 6 *East*, 21, *(note)* per *Buller*, J.

*Winder* and *Winchester*, for the Appellee, contended, that independent of the question of fraud and collusion between *Owings* and *Minor*, and admitting that *Owings* really and *bona fide* became the partner of *Minor* as alleged, yet his voluntarily allowing *Minor* to retain in his hands the ordinary and regular documents by which he could represent the property to third persons to be his own, and by this means having induced the appellee to become answerable for him, gave to the appellee such an equitable lien as a court of chancery will enforce in preference to the right of *Owings*.

CHASE, Ch. J. delivered the opinion of the Court. The court are of opinion, that *Owings*, the appellant, as supercargo and consignee of the outward cargo, and in virtue of the verbal agreement proved, and the written agreement by which he became interested in one third of the cargo, had a right to retain the inward cargo, and had a lien thereon to reimburse himself for all advances made by him, and to satisfy any balance which might be due to him on a final adjustment of the transactions in trade between himself and *Minor*. The alteration made in the bill of lading by *Owings* was made for the purpose of enabling him to enter the inward cargo, *Minor* having become insolvent and absconded. *Owings*, in making the alteration, did not act fraudulently, nor did he acquire any new rights thereby; he was the shipper of the goods, and the bill of lading was in his possession, and under his control, and he had a right to stop the goods *in transitu*. So long as *Owings* retained the possession of the goods, he had a lien on them to satisfy all legal demands, and he could not be divested of his possession by *Minor*, or any person claiming under him, until they were satisfied. *Karthaus*, the appellee, in virtue of the assignment to him from *Minor*, stood in his place, and did not thereby acquire an interest in the outward cargo superior to that which vested in *Minor* previous to his making the assignment.

The court are of opinion that the transaction on the part of *Owings* is not tinctured with fraud, and that the decree of the court of chancery be reversed with costs.

It appears to the court that it is not necessary to determine what would have been the situation of the parties if the agreement before mentioned had not existed.

DECREE REVERSED.